UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| TERRA D. WELLS, | ) | C/A No.: 4:07-1007-GRA-TER |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | (Written Opinion) |
| MICHAEL J. ASTRUE, COMMISIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This matter is before the Court to issue a final order on the magistrate's Report and Recommendation made in accordance with Local Rule 73.02(B)(2)(a), D.S.C., issued on November 30, 2007. Terra D. Wells (Plaintiff) brought this action pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1381(c)(3) seeking judicial review of the Commissioner's final decision denying the plaintiff's claims for Disability Insurance Benefits (DIB) and Supplemental Security Income Benefits (SSI). The magistrate recommends that the Commissioner's decision be affirmed.

## Procedural Background

The plaintiff, Terra Wells, filed an application for DIB on February 4, 2004, and SSI on December 19, 2003, alleging disability since November 8, 2002. The Commissioner denied the applications both initially and on reconsideration. Following a hearing, the administrative law judge (ALJ) found, on July 19, 2006, that the

plaintiff was not disabled. The ALJ's decision became the final decision of the Commissioner when it was approved by the Appeals Council. *See* 20 C.F.R. § 404.981.

## Factual Background

The plaintiff was born on December 23, 1970 and was 35 years of age on the date of her hearing before the ALJ. (Tr. 321, 335). The plaintiff has an eighth grade education (Tr. 336) and has past relevant work as a housekeeper, cook, sewing machine operator and battery filler (Tr. 353-354).

On November 8, 2002, Plaintiff was injured on the job while working as a housekeeper at Cumberland Village when she slipped on a wet floor, and landed on her back and right side. (Tr. 209). She was evaluated at Doctor's Care, in Aiken, South Carolina, treated, and referred to Dr. Donald K. McCartney. (Tr. 209).

On December 12, 2002, Plaintiff went to Dr. McCartney with neck, and upper thoracic pain between her shoulders and down her right arm. (Tr. 192). Dr. McCartney ordered an MRI of the cervical spine and neurodiagnostic testing. (Tr. 192.) Imaging records of the cervical MRI revealed a C3-4 disc bulge, and C5-6 disc disease without focal compromise. (Tr. 297). Dr. Melvyn L. Haas, performed electrodiagnostic studies on December 17, 2002. Dr. Haas's impression was C6 radiculopathy right, and thoracic outlet syndrome. (Tr. 299-300).

Dr. McCartney's records from January 7, 2003, noted a C3-4 disc bulge, a C5-6 disc bulge and neurodiagnostic results showed C6 radiculopathy on the right side

consistent with thoracic outlet bilaterally. (Tr. 191). Dr. McCartney referred the Plaintiff for epidural steroid injections of her cervical spine and recommended physical therapy. (Tr. 191). During an examination the following month, the plaintiff claimed the epidural steroid injections and therapy had not helped. (Tr. 190). Dr. McCartney discontinued therapy. (Tr. 190). Additionally, he referred the claimant for a CT myelogram and to Dr. Ty Carter for possible surgery. (Tr. 190).

On March 12, 2003, a cervical myelogram revealed some posterior disc bulging at C2-C3 and C5-C6, left-sided disc bulge at C3-C4, indenting the left anterior thecal sac. (Tr. 309-311). However, this did "not result in significant canal or foraminal compromise." (Tr. 310).

Dr. Carter examined the claimant on March 21, 2003. He diagnosed "[c]ervical degenerative disc disease C5-6, C3-4 and right arm radiculopathy" and scheduled Plaintiff's back surgery. (Tr. 188). Plaintiff came in for a pre-surgery visit with Dr. Carter on March 31, 2003, claiming she was unable to tolerate even light duty work, and requested a second opinion before proceeding with surgery. (Tr. 186).

Plaintiff went for a second opinion with Dr. Mendel on April 10, 2003. (Tr. 301). After an exam of the Plaintiff and review of her file, Dr. Mendel diagnosed her with degenerative disc disease, with right-sided radiculopathy. (Tr. 303). He concurred that the source of her pain was most likely the C5-6. (Tr. 302)

Plaintiff was admitted to Aiken Regional Medical Center for surgery on April 16, 2003. (Tr. 128). Dr. Carter performed an anterior cervical diskectomy, and anterior

cervical plating. (Tr. 128). Dr. Carter's post-op diagnosis was degenerative disc disease, spondylosis and bulging disc at C5-6 with right arm radiculopathy. (Tr. 128). The pathology report diagnosed "fibrocartilage consistent with disc material with degenerative changes." (Tr. 308).

One week post-op, Dr. Carter evaluated Plaintiff who complained of interscapular and left shoulder pain. (Tr. 185). Dr. Carter felt that the interscapular and left shoulder pain were partly due to the stretch of the C5-6 nerve root. (Tr. 185). Plaintiff returned to Dr. Carter the following week complaining of continued post-op pain extending into her lower thoracic and lumbar spine and left arm. (Tr. 184). Upon exam, Dr. Carter found Plaintiff tender in the trapezius and from around T10-11 of the thoracic spine to her lumbar spine. (Tr. 184).

Plaintiff attended physical therapy from May 5, 2003 until June 9, 2003 at Sports Plus in Aiken, South Carolina. (Tr. 113). She was assessed with post-traumatic injury with pain in the neck, upper trapezius and thoracic region. (Tr. 113-118). The discharge summary noted that Plaintiff responded poorly to overall therapy. (Tr. 118).

On June 6, 2003, Plaintiff had a six-week post-op follow-up with Dr. Carter. Plaintiff stated that she continued to have pain in her shoulder blades, neck and arms. (Tr. 183). Dr. Carter ordered a Functional Capacity Evaluation to determine if she had an impairment restricting her employment. (Tr. 183).

Plaintiff returned June 24, 2003, before her scheduled visit to Dr. Carter complaining that she was experiencing increasing amounts of pain, felt the medication

was not helping and she was not getting adequate care from him. (Tr. 180). She claimed to be unable to perform the light duty job that was provided for her. (Tr. 180). Dr. Carter decided to hold her out of work until August after she had the Functional Capacity Evaluation and he could further evaluate her for an impairment rating. (Tr. 181).

Hitchcock Healthcare performed a Physical Work Performance evaluation of Plaintiff on July 15, 2003. (Tr. 123-126). The plaintiff was found to significantly self-limit her behavior. (Tr. 123). Plaintiff was assessed with an overall work level consistent with performing physical work that was described as being at the "light" level. (Tr. 126). The evaluation determined she could never stand on a job, could sit only occasionally, and could carry only 12 pounds. (Tr. 126).

Plaintiff's four-month status post-surgery exam with Dr. Carter was on August 11, 2003. Plaintiff complained of shoulder and arm pain, and about the care she had received. (Tr. 180). Plaintiff's Functional Capacity Evaluation report rated her able to perform light physical duty only. Dr. Carter listed her as a DRE Cervical Category 3 with a 15% impairment of her whole person. (Tr. 180). The plaintiff advised Dr. Carter that she no longer wished to be treated by him, and he indicated he would not provide further treatment. However, Plaintiff returned to Dr. Carter on September 2, 2003. Dr. Carter opined that Plaintiff should be limited to working 4-6 hours per day, and adjusted her impairment rating to eighteen percent (Tr. 179).

On January 26, 2004, Dr. Carter noted that she had a myelogram which

revealed no significant C3-4 disease, no nerve root impingement, and a solid fusion at the C5-6 level with no neuroforamen encroachment. (Tr. 175). Additionally, Dr. Carter noted that the plaintiff "does not have a lot of motivation to go back to work," and "I think disability is probably a good move for her." (Tr. 175). The plaintiff next saw Dr. Carter on March 15, 2004 and complained of neck pain, requested a medication change, and requested a referral to Dr. Page for breast reduction. (Tr. 294).

The plaintiff was referred to Dr. W. Daniel Westerkam of Physical Medicine and rehabilitation to provide an independent medical examination and evaluation October 14, 2003. (Tr. 209). Plaintiff stated she had neck and upper back pain, with numbness and tingling radiating down the right arm, and occasional, severe headaches. (Tr. 209). Muscle testing revealed breakaway weakness throughout the upper and lower extremities. (Tr. 210). Dr. Westerkam noted a limited range of motion of the lumbar spine. (Tr. 210). Dr. Westerkam recommended progressively reintegrating the plaintiff into the workforce by allowing her to work four hours a day for two weeks, six hours a day for two weeks and ultimately a full eight hour day. (Tr. 211). He limited her weight lifting to 15 pounds and recommended that she not kneel, crawl or do any overhead work, with only occasional repetitive activity with her right upper extremity. (Tr. 211). Dr. Westerkam gave Plaintiff a whole person impairment of 18% and an 18% spinal impairment. (Tr. 211).

Dr. Carter examined Plaintiff on December 15, 2003. She had increased her

activity but continued to have some right shoulder pain, and increasing left shoulder pain. (Tr. 178). An MRI taken prior to surgery showed a left disc bulge at C3-4, and Dr. Carter felt that it may be the source of her pain. (Tr. 178). X-rays of C5-6 disc level showed a solid fusion. (Tr. 178).

David D. Goltra performed a cervical myelogram on January 20, 2004. (Tr. 176). The fusion at C5-6 appeared to be in position. (Tr. 176). At C3-4, there was some broad based annular protrusion to the left mildly effacing the subarachnoid space and some flattening of the left side of the spinal cord. (Tr. 177). At C4-5, there was some broad based annular protrusion to the left. (Tr. 177). There was a slight deformity of the left side of the spinal cord. (Tr. 177). At C6-7, there was some mild loss of height within the intervertebral disc space. (Tr. 177). Dr. Goltra noted some mild disc disease at C3-4 and C4-5. (Tr. 177).

Dr. Carter referred Plaintiff to cardiologist, Dr. Idris S. Sharaf on February 2, 2004. (Tr. 202). Plaintiff reported having progressive chest pain, left arm pain with aching and throbbing, and finger numbness. (Tr. 202). Dr. Sharaf recommended an echocardiogram and nuclear stress test. (Tr. 203). Plaintiff's echocardiogram impression revealed a possible slight posterior mitral valve prolapse with trace mitral regurgitation with no other abnormalities. (Tr. 205). Plaintiff's nuclear stress test on February 9, 2004, was normal. (Tr. 201).

Based on these results, Dr. Sharaf believed that the Plaintiff suffered from atypical non-cardiac chest pain and possible slight mitral valve prolapse with trace MR.

(Tr. 200). He recommended she continue with chronic cardiac risk factor modification and consult Dr. Page for a possible breast reduction. (Tr. 200).

On March 19, 2004, Dr. S. El Ibiary, a state agency non-examining, non-treating physician, completed a Residual Functional Capacity Assessment (RFC) on the Plaintiff. ( Tr. 260-270). Dr. El Ibiary limited Plaintiff to light work. Dr. El Ibiary rated her with severe musculoskeletal impairment to the back and cervical spine. (Tr. 261). He assessed her limitations as allowing her to lift 20 pounds occasionally, 10 pounds frequently, stand, walk or sit, 6 hours in an 8-hour workday. (Tr. 264).

On April 9, 2004, Plaintiff was treated at Saluda Family Medicine for complaints of neck pain, recurrent chest pain, and depression. (Tr. 214) The physical exam was benign and noted that she had a full range of motion on her back and arms. (Tr. 214).

On May 6, 2004, Dr. Kern examined the plaintiff at the Pain Management Clinic at MCG Hospital. (Tr. 218, 224-226). Dr. Kern evaluated Plaintiff on May 5, 2004, with Axis I, major depressive disorder and chronic pain disorder. (Tr. 221). Axis III failed neck surgery syndrome, upper extremity radiculopathy, and cervical spondylosis. (Tr. 221). Dr. Kern recommended psychological counseling. (Tr. 221).

On July 20, 2004, Dr. Hugh A. Clarke provided a Physical Residual Functional Capacity Assessment on the Plaintiff. (Tr. 233-241). Dr. Clarke rated her with severe musculoskeletal impairment to the back and cervical spine. (Tr. 233).

Dr. Carter completed a disability questionnaire on October 1, 2004, in which he deviated from his previous recommendations. *See* (Tr. 271). In his medical opinion,

Plaintiff was unable to engage in full time work because she would likely miss more than three days of work a month. (Tr. 271).   Dr. Carter assessed her physical limitations as follows: lifting 10 pounds or less, pushing and pulling 10 pounds or less, no continuous walking or standing, no crawling, kneeling, stooping, bending and no continuous sitting. (Tr. 272).

Dr. Carter referred Plaintiff to Dr. J. Gruber in Johnston South Carolina. Plaintiff complained of knee, wrist and metacarpal pain, elbow and shoulder pain.  (Tr.280). Plaintiff had some fluid on the knees. Dr. Gruber assessed her with rheumatoid arthritis, and ordered lab tests and rheumatoid factors. (Tr. 280).

### **Hearing Testimony**

The plaintiff's hearing was held on April 13, 2006 before Albert A. Reed, Administrative Law Judge.   Plaintiff stated that she currently lives in Johnston, South Carolina with her husband and three minor children. (Tr. 335, 337).    Plaintiff completed her education to an eighth grade level. (Tr. 336). The Plaintiff testified her past work experience included work as a custodian/housekeeper, a cook, a sewing machine operator and a battery filler on an assembly line. (Tr. 338).   Plaintiff stated that she was unable to work due to constant pain in her neck, back and shoulder and that surgery had no given her no relief or change from her condition.   (Tr. 340). Plaintiff claimed to have  limitations on a daily basis due to her multiple problems. (Tr. 342, 347). Plaintiff stated that her pain and inability to provide for her children has caused her to be depressed. (Tr. 343).

Plaintiff attempted to return to her job at Cumberland Village after her neck surgery. She was put on light duty answering phones, but was unable to sit down all day long, because it put strain on her neck. (Tr. 344). Plaintiff stated that she continually changes position from sitting to lying down in an effort to relieve her neck pain. (Tr. 344).

Plaintiff stated that she would be unable to use her arms and hands on a regular basis of 5-6 hours daily. (Tr. 348). Plaintiff's shoulder and neck problems limit her ability to lift her arms overhead. (Tr. 348). Plaintiff alleged other physical problems including chest pain, and arthritis in hands and knees. She is unable to stoop, squat, bend over, pick items up, grip or grasp. (Tr. 350-351).

The ALJ then examined Robert Brabham, vocational expert, regarding assessment of the Plaintiff's work history, skill level, and exertion level. The vocational expert described Plaintiff's job as a housekeeper as unskilled work, which required medium physical exertion. (Tr. 353). Her work as a cook was classified as semi-skilled at the light level. Work as a sewing machine operator was classified as semi-skilled work at the light level. (Tr. 353). Work as a battery filler on an assembly line was classified as unskilled work at the light excertional level. (Tr. 353-54). In response to a hypothetical question provided by the ALJ, the vocational expert cited several unskilled sedentary and light jobs the hypothetical individual could perform including hand packer, machine tender, garment folder and surveillance monitor. (Tr. 354-356).

When questioned by Plaintiff's counsel, vocational expert Brabham stated that accepting Plaintiff's limitations as credible, specifically with her regards to her ability to sit, stand, lift, and her need to frequently lie down, Plaintiff would be unable to perform any work on a sustained basis. (Tr. 356-57).  Additionally, Mr. Brabham noted that the Plaintiff's inability to use her hands would eliminate most of the recommended jobs. (Tr. 358).   Additionally, Mr. Brabham noted that most of the light-unskilled and sedentary unskilled work required use of the hands. (Tr. 358).  ALJ Reed then closed the record and adjourned the hearing. (Tr. 361).

## Disability Analysis

In the decision of July 19, 2006, the ALJ found the following:

(1) The claimant meets the insured status requirements of the Social Security act through June 30, 2007.

(2) The claimant has not engaged in any substantial gainful activity since November 8, 2002, the alleged onset date (20 CFR 404.1520(b), 404.1571 et seq., 416.920 (b) and 416.971 et seq.

(3) The claimant has the following severe impairments: musculoskeletal impairments of the neck, shoulders and back, and depression (20 CFR 404.1520c and 416.920 (c)).

(4) The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appx. 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920 (d), 416.925 and 416.926).

(5) After careful consideration of the entire record, I find that the claimant has the residual function capacity [RFC] to lift and carry up to twenty pounds occasionally and ten pounds frequently; stand and walk for up to two-thrids of the work day and sit throughout the work day with an option to alternate sitting and standing at intervals of one hour or more; and occasionally balance, stoop crouch, knell and crawl.  She may never

> climb or balance; and may not perform repetitive overhead reaching. The claimant's mental impairments, as described above further restrict her residual functional capacity to simple unskilled work in a low-stress, supervised environment.
>
> (6) The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).
>
> (7) The claimant was born on December 23, 1970, and was 31 years old on the alleged disability onset date, which is defined as a younger individual age 18-44 (20 CFR 404.1563 and 416.963).
>
> (8) The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).
>
> (9) Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled", whether or not the claimant has transferable job skills (§ SSR 82-41 and 20 CFR Part 404, Subpart B, Appendix 2).
>
> (10) Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560 (c), 404.1566, 416.960(c), and 416.966).
>
> 11) The claimant has not been under a "disability" as defined in the Social Security Act, from November 8, 2002, through the date of this decision (20 CFR 404.1520 (g) and 416.920 (g)).

(Tr. 16-24).

### **Standard of Review**

The role of the federal judiciary in the administrative scheme established by the Social Security Act is a limited one. Section 205(g) of the Act provides: "The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). "Substantial evidence has been defined

innumerable times as more than a scintilla, but less than a preponderance." *Thomas v. Celebrezze,* 331 F.2d 541, 543 (4th Cir. 1964). This standard precludes *de novo* review of the factual circumstances that substitute the court's findings for those of the Commissioner. *Vitek v. Finch*, 438 F.2d 1157, 1157 (4th Cir. 1971). The court must uphold the Commissioner's decision as long as it is supported by substantial evidence. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). "From this it does not follow, however, that the findings of the administrative agency are to be mechanically accepted. The statutorily granted right of review contemplates more than an uncritical rubber stamping of the administrative action." *Flack v. Cohen*, 413 F.2d 278, 279 (4th Cir. 1969). "[T]he courts must not abdicate their responsibility to give careful scrutiny to the whole record to assure that there is a sound foundation for the Secretary's findings, and that his conclusion is rational." *Vitek*, 438 F.2d at 1157-58.

The Commissioner's denial of benefits shall be reversed only if no reasonable mind could accept the record as adequate to support that determination. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). The Commissioner's findings of fact are not binding, however, if they were based upon the application of an improper legal standard. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

By contrast, the magistrate makes only a recommendation to this Court. The recommendation has no presumptive weight, and responsibility for making a final determination remains with this Court. *Mathews v. Weber*, 423 U.S. 261, 270-71

(1976). This Court is charged with making a *de novo* determination of those portions of the Report and Recommendation to which specific objection is made, and this Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1). This Court may also "receive further evidence or recommit the matter to the magistrate with instructions." *Id.*

In order for objections to be considered by a United States District Judge, the objections must be timely filed and must specifically identify the portions of the Report and Recommendation to which the party objects and the basis for the objections. Fed. R. Civ. P. 72(b); *see Wright v. Collins*, 766 F.2d 841, 845-47 nn.1-3 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91,94 n.4 (4th Cir. 1984). "Courts have . . . held *de novo* review to be unnecessary in . . . situations when a party makes general and conclusory objections that do not direct the court to a specific error in the magistrate's proposed findings and recommendation." *Orpiano v. Johnson*, 687 F.2d 44, 47 (4th Cir. 1982). Furthermore, in the absence of specific objections to the Report and Recommendation, this Court is not required to give any explanation for adopting the recommendation. *Camby v. Davis*, 718 F.2d 198 (4th Cir. 1983). The plaintiff has made two specific objections to the magistrate's Report and Recommendation.

### Discussion

1. **THE FIRST OBJECTION:** *"The Magistrate failed to acknowledge that the actual basis for the ALJ's dismissal of Dr. Ty Carter's opinion of disability was not supported by substantial evidence."*

The first specific objection made by the Plaintiff is that the dismissal of the Dr. Carter's, the treating physician's, opinion was not supported by substantial evidence. "Courts typically accord greater weight to the testimony of the treating physician because the treating physician has necessarily examined the applicant and has a treatment relationship with the applicant." *Hines v. Barnhart*, 453 F.3d 559, 563 (4th Cir. 2006) (internal quotations, citations, and footnote omitted). However though the opinion of a treating physician is generally entitled to "great weight," the ALJ is not required to give it "controlling weight." *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996). In fact, "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Id.*; *see also Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam) (stating "The ALJ may choose to give less weight to the testimony of a treating physician if there is persuasive contrary evidence").

There is substantial evidence to support the weight afforded to Dr. Carter's October 2004 report in the ALJ's decision. First, the ALJ found that Dr. Carter's opinion was not supported by his previous clinical findings. Prior to his October 2004, report Dr. Carter had, following numerous examinations prior to his October 2004, determined that the plaintiff was able to perform light work. (Tr. 21-22). Additionally, the ALJ noted that when Dr. Carter altered his opinion in October 2004, he had not examined the plaintiff for over six months. (Tr. 21-22). Finally, the ALJ's decision is consistent with other medical conclusions in the record, including the

Functional Capacity Evaluation and Dr. Westerkam. Thus, the weight given by the ALJ to Dr. Carter's October 1, 2004 report is appropriate, and supported by substantial evidence. Accordingly, this objection is without merit.

**2. THE SECOND OBJECTION:  "The ALJ was required to provide reasons for failing to include the restrictions indicated in the FCE and in Dr. Westerkam's statement in the Plaintiff's RFC."**

The second specific objection offered by the plaintiff is that because the ALJ did not provide reasons for excluding the restrictions offered by Dr. Westerkam and the Functional Capacity Evaluation the case should be remanded for further findings. The Fourth Circuit Court of Appeals has held that a remand is necessary to clarify the basis to deny benefits. For instance, in *Arnold v. Secretary*, the court vacated and remanded the administrative law judge's decision denying benefits, stating that "[u]nless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole.'" *Arnorld v. Secretary*, 567 F.2d 258, 259 (4th Cir. 1977) (quoted with approval in *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984)); *see also Murphy v. Bowen*, 810 F.2d 433, 437 (4th Cir. 1987) (remanding the case to the Agency because the law judge did not credit one doctor's views over those of another doctor).

As required by SSR 96-8p, the ALJ must "include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts

. . . and nonmedical evidence." This ruling further provides:

> In assessing RFC, the adjudicator must discuss the individual's capacity to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week or an equivalent work schedule), and describe the maximum amount of each work related activity the individual can perform based on the evidence available in the case record. *The adjudicator must also explain how any material inconsistencies or ambiguities in the in the evidence in the case record were considered and resolved*.

*Id. (emphasis added).* Furthermore, "[t]he ALJ is not required to discuss every piece of evidence, but if he does not mention material evidence, the court cannot say his determination was supported by substantial evidence." *Seabolt v. Barnhart*, 481 F.Supp.2d 538, 548 (D.S.C.,2007). Accordingly, the ALJ must discuss evidence if it is 1) material and 2) inconsistent. The plaintiff asserts that the restrictions found in the reports of Dr. Westerkam and the Functional Capacity Evaluation constituted material evidence that the ALJ was required to discuss. This Court agrees.

### a) Materiality

The restrictions offered by Dr. Westerkam and Functional Capacity Evaluation constitute material evidence. The Social Security regulations set forth a five step sequential evaluation process. That process requires the adjudicator to consider whether a disability claimant: (1) worked during the alleged period of disability; (2) had a severe impairment; (3) had a condition which met or equaled the severity of a listed impairment; (4) could return to her past relevant work; and, if not, (5) could perform other work in the national economy. *See* 20 C.F.R. § 404.1520(a)(4). If the claimant

is found non-disabled at any step in the sequential evaluation process, further evaluation is unnecessary. *Id.*

The individual seeking benefits bears the burden of production and proof during the first four steps of the inquiry. *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995). "If he or she is able to carry this burden through the fourth step, the burden shifts to the Secretary in the fifth step to show that other work is available in the national economy which the claimant could perform." *Id.* The ALJ determined that the plaintiff satisfied the first four steps. Accordingly, if the Secretary is unable to demonstrate that the plaintiff could perform sufficient jobs in the national economy, she will be entitled to benefits.

The medical restrictions of Dr. Westerkam and the Functional Capacity Evaluation are material because they bear directly on the plaintiff's ability to work in the national economy. In Dr. Westerkam's examination, he recommends that the plaintiff "only do occasional repetitive activities with the upper right extremity." (Tr. at 211). Similarly the Functional Capacity Evaluation provided that the claimant could only occasionally sit, and could never stand. (Tr. 126). However, these recommendations were not discussed in the ALJ's Residual Functional Capacity Assessment.

Based on the testimony of the vocational expert, Mr. Bradham, the plaintiff would be unable to find work in the national economy if the restrictions imposed by the Dr. Westerkam and the Functional Capacity Evaluation were adopted into the

Residual Functional Capacity Assessment.  Mr. Bradham, testified that if the plaintiff were limited to occasional use of her hands it would preclude the large majority of light-unskilled, and sedentary- unskilled jobs, including many of the positions offered to the ALJ.  *See* (Tr. 357-58).  Similarly, Mr. Bradham, testified that if the claimant was unable to sit for a prolonged period of time, and needed to lie down, she would be unemployable. (Tr. 357).  Thus, if the ALJ accepted the restrictions offered by the Functional Capacity Evaluation and Dr. Westerkam into the Residual Functional Capacity Assessment, the plaintiff would be entitled to benefits.

b) **Inconsistency**

The expressed acceptance and usage of Dr. Westerkam's and the Functional Capacity Evaluation's conclusions without accepting their underlying recommendations creates an inconsistency which must be considered and resolved by the ALJ. The ALJ relied on the conclusions of both Dr. Westerkam's and the Functional Capacity Evaluation both to establish the plaintiff's ability to do "light work," and to discharge the opinion of the Dr. Carter, the claimant's treating orthopedist.  *See* (Tr. at 21). However, the ALJ did not accept, or discuss, the limitations included in these reports. The acceptance of the conclusions, without the acceptance of the material restrictions the examiners placed on the conclusions creates an inconsistency which must be examined by the ALJ.[1]    *See Hines v. Barnhart*, 453 F.3d 559, 566 (4th Cir. 2006)

---

[1]This is not to suggest that the ALJ must take an "all-or-nothing" approach to the findings of Dr. Westerkam and the Functional Capacity Evaluation.  Instead the ALJ must only explain his decision to discount material portions of these

(stating "An ALJ may not select and discuss only that evidence that favors his ultimate conclusion").  Therefore, this Court must remand this case to the ALJ for an evaluation of the restrictions found in the medical report of Dr. Westerkam and the Functional Capacity Evaluation.

Accordingly, the Court DECLINES TO ADOPT the magistrate's Report and Recommendation and  REMANDS this case to the ALJ for an evaluation of the restrictions imposed by Dr. Westerkam and the Functional Capacity Evaluation.

IT IS SO ORDERED.

                                                    *[signature]*

                                                    G. ROSS ANDERSON, JR.
                                                    UNITED STATES DISTRICT JUDGE

Anderson, South Carolina

September    19  , 2008

---

findings that are inconsistent with the ultimate Residual Functional Capacity Assessment.